THE STATE OF OHIO, APPELLEE, *v.* SEIBER, APPELLANT.

[Cite as State *v.* Seiber (1990), 56 Ohio St. 3d 4.]

(No. 89-1391—Submitted September 18, 1990—Decided December 5, 1990.)

*Michael Miller*, prosecuting attorney, and *Alan C. Travis*, for appellee.

*James Kura*, county public defender, *Paul Skendelas* and *Allen V. Adair*, for appellant.

ALICE ROBIE RESNICK, J. We have reviewed appellant's twenty-one propositions of law, independently assessed the evidence relating to the death sentence, balanced the aggravating circumstances against the mitigating factors, and reviewed the proportionality of the sentence to those imposed in similar cases. As a result, we affirm the convictions and sentence of death.

## I

### *Appropriateness of Death Penalty*

In his initial proposition of law, appellant argues that the death penalty is not appropriate in his case. Appellant asserts that we should conclude, after independently assessing the case under R.C. 2929.05, that the aggravating circumstances do not outweigh the mitigating factors.

The evidence supports the aggravating circumstances the jury found appellant guilty of committing, *i.e.,* the kidnapping of Alvie and Louis Schoenberger and Stanton Norris. Appellant deliberately returned to the bar, approximately forty minutes to an hour after he had left, but now armed and in the company of a person armed with a shotgun; prevented anyone from leaving; and repeatedly threatened to kill the Schoenbergers, forcing them to lie on the floor. Appellant then roamed the bar looking for their friends. He terrorized the Schoenbergers and others for approximately twenty to forty minutes and shot Norris when Norris refused to obey his order to get on the floor. Appellant continued his rampage by chasing Louis and generally threatening everyone. The ordeal ended only after a policeman, after warning appellant to drop his gun, shot him. This evidence proved a calculated, prolonged, and unprovoked kidnapping of at least three persons, together with continued threats of violence and death, in the course of which appellant purposefully killed Norris.

Appellant established in mitigation that he had lifelong health, mental and adjustment problems. When appellant was eleven years old, a truck hit him and he suffered a "cerebral contusion," spending five days in a hospital. In April to June 1963, and from November 1964 to September 1965, appellant was a patient at Columbus State Hospital. Doctors diagnosed him as suffering from an adjustment reaction to adolescence. In June 1966, appellant joined the United States Army and served in Vietnam. In April 1968, following exhibitions of rage and

violence, the army found appellant unfit for further military service. An army medical board diagnosed appellant in these words: "[p]sychotic reaction, paranoid type, intermittent and recurrent, * * * manifested by uncontrolled anxiety and rage, by feelings of being in a hostile, persecuting world and by terrible and total distrust of anyone."

Following his Army discharge, appellant joined a motorcycle gang, the Outlaws, wandered around the country, and lived a troubled, marginal life. At times, Veterans Administration ("VA") and other hospitals treated appellant. In September 1968, a Columbus State Hospital diagnosis concluded he was a schizophrenic, paranoid type. In October 1968, a VA hospital diagnosis noted a schizophrenic reaction, chronic undifferentiated type. In April 1970, after being hit in the head with a wrench, appellant was hospitalized for a scalp laceration. In 1983, following an automobile accident, he was hospitalized several weeks for head injuries and several broken bones. In April 1984, following a VA psychiatric consultation, appellant was diagnosed as having an anti-social personality disorder. In June 1984, VA officials believed that appellant had a psychopathic personality structure and at times lapsed into paranoid ideation with rapid recovery, and that appellant was "vulnerable to even slight stressors, which may trigger panic attacks and possible psychotic episodes."

Two mental health professionals testified at appellant's mitigation hearing. Sheila Porter, a psychiatric social worker, noted that appellant had consistent difficulty with school expulsions, fighting, and assaultive behavior in childhood. Since childhood, appellant had suffered "intermittent lapses into delusional paranoid idea-

tion representing brief psychotic episodes." Porter believed that if appellant, at the Village Lounge, "were in one of these episodes of psychotic thinking and paranoid ideation that he would lack the capacity to conform his behavior to the requirements of the law." However, appellant related a fictionalized account of the events at the Village Lounge to Porter, who knew little of what actually happened there. Porter never testified that appellant actually was in a psychotic episode at the time of the offense.

Dr. Bruce Goldsmith, a clinical psychologist, knew nothing of the actual events at the Village Lounge, other than what he had read in the newspaper. Appellant told Goldsmith he did not remember anything about that night. Goldsmith reviewed appellant's medical history, interviewed him, and also gave him various psychological tests. Appellant displayed excellent intelligence, ability to concentrate and short-term memory, and was quite adept at higher level abstract thinking. Goldsmith detected that appellant was guarded, evasive, and exhibited selective memory. When interviewed, appellant showed no paranoia, delusions, or thought insertion (outside persons controlling him). Organic brain damage was a distinct possibility. Appellant viewed the world as a hostile, threatening, dog-eat-dog world, thereby reflecting consistent antisocial thinking. During the interview, appellant exhibited some signs of psychotic thinking, but he recovered quickly and within moments was back on track thinking rationally. Goldsmith concluded: "Diagnostically, I believe the most salient feature of Mr. Seiber is unquestionably his antisocial personality disorder. This disorder has been evident since at least 1963 when he was 15 years old. He has a long history of continuous antisocial

behavior, which has included violent acting-out, inability to sustain consistent work behavior, * * * failure to accept social norms, with respect to lawful behavior * * * and poor impulse control."

Goldsmith also believed that appellant suffered from paranoid tendencies and did not trust anybody; and that appellant had poor abilities to cope with stress and tended to decompensate to psychotic proportions for brief periods of time. Because of appellant's ingrained anti-social personality disorder, Goldsmith concluded that appellant lacked substantial capacity to conform his behavior to legal requirements.

At trial, appellant's mother testified on his behalf and described his life, frequent hospitalizations, and family history. Appellant did not hold steady employment, but he did receive a VA disability pension. Since his county jail incarceration in May 1985, he did not have any disciplinary infractions.

In considering possible mitigating factors, nothing in the nature or circumstances of the offense was mitigating. No one threatened or assaulted appellant during his initial visit to the bar that night. After appellant left the bar, he obtained a firearm, and accompanied by an armed accomplice returned to avenge himself over a presumed affront. Upon his return, he immediately acted violently, terrorized various patrons, and ignored the rights of everyone else in the bar.

Appellant's history presents some mitigating features, especially his lifelong health and mental problems; however, his character and background are not mitigating. Aside from his ingrained anti-social personality disorder, appellant's documented history in 1968 reveals psychosis, schizophrenia, and paranoia; and, more recently, intermittent lapses into paranoid ideation and psychotic episodes. Thus, appellant's lifelong mental problems represent a significant mitigating factor. Aside from his physical and mental problems, and Vietnam service, appellant's background does not reveal any mitigating features. Clearly, appellant has not displayed any mitigating character traits in his life.

After independently assessing the evidence, we conclude that neither of the possible mitigating factors in R.C. 2929.04(B)(1) or (2) applies. Appellant argues that Norris, by turning his back and refusing to lie down on the floor, induced or facilitated the offense. In *State* v. *Lawrence* (1989), 44 Ohio St. 3d 24, 32, 541 N.E. 2d 451, 459-460, the victim provoked the confrontation. However, Norris, the victim in this case, simply wanted to be left alone and sought no confrontation. Norris did nothing except to refuse, courageously or foolishly, to obey appellant's order to lie down on the floor. Simply because a victim ignores an armed gunman who is unlawfully threatening him does not mean he induced or facilitated his own murder. *State* v. *Clark* (1988), 38 Ohio St. 3d 252, 263, 527 N.E. 2d 844, 856.

Nor was appellant acting under duress, coercion, or strong provocation as contemplated in R.C. 2929.04(B)(2). Appellant apparently felt humiliated over the Schoenbergers' complaint about his lewd comments. However, his voluntary choice to react as he did, belatedly and violently, does not show duress, coercion or strong provocation. No outside force or person pressured appellant to act as he did.

Despite appellant's claim, we do not find mental disease or defect established under R.C. 2929.04(B)(3) as a mitigating factor. That statute re-

quires that "at the time of committing the offense, * * * [appellant], because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Appellant failed to establish that factor for several reasons. First, the defense evidence did not specifically link appellant's mental problems to his conduct at the Village Lounge. Neither Porter nor Goldsmith knew any of the facts of the offenses, other than what was reported in the newspaper. In fact, neither expressed a precise opinion that "at the time of committing the offense" appellant lacked substantial capacity to conform his conduct to the law.

Second, proof of a mental disease or defect was lacking. Goldsmith did assert appellant generally lacked substantial capacity to conform his conduct to legal requirements. However, in Goldsmith's view, appellant's impaired capacity and violent acts arose from appellant's ingrained anti-social personality disorder rather than from his psychosis. Although Goldsmith classified this personality disorder as a mental disease or defect, an anti-social personality disorder does not constitute a "mental disease or defect" within the meaning of R.C. 2929.03(B)(3). See *State* v. *Van Hook* (1988), 39 Ohio St. 3d 256, 263, 530 N.E. 2d 883, 889-890; *State* v. *Cooey* (1989), 46 Ohio St. 3d 20, 41, 544 N.E. 2d 895, 919.

Third, by his actions that night, appellant demonstrated that he knew what he was doing and that what he was doing was wrong. This was evidenced by the fact that after the shooting, he urged all the bar patrons to tell a false story as to who shot Norris, and threatened to kill them if they did not.

Appellant does not contend that the mitigating factors in R.C. 2929.04(B)(4) through (6) are relevant. Appellant, thirty-seven years old at the time of the offenses, had a prior 1976 manslaughter conviction, and he was the principal offender in the aggravated murder.

However, we do conclude, after our independent assessment, that other mitigating factors, as contemplated in R.C. 2929.04(B)(7), were present as established by appellant. Appellant's family history, physical health problems, and lack of disciplinary infractions in jail qualify as mitigating evidence, though of minimal significance. See *Eddings* v. *Oklahoma* (1982), 455 U.S. 104. Appellant's psychological and mental problems, though not qualifying under R.C. 2929.04(B)(3), are directly relevant under R.C. 2929.04(B)(7), as Judge Peggy Bryant, concurring separately in the court of appeals, concluded. Appellant suffers from an ingrained anti-social personality disorder, with psychotic lapses and paranoid ideation. Even if the evidence did not show psychotic episodes or paranoid ideation that night, his lifelong mental illness is a mitigating "other factor."

After independently weighing the evidence, we conclude that the aggravating circumstances outweigh the mitigating factors. Under all the circumstances, we conclude the death penalty is appropriate. The sentence of death is neither excessive nor disproportionate to the penalty imposed in other felony-murder cases involving a kidnapping. See *State* v. *Brewer* (1990), 48 Ohio St. 3d 50, 549 N.E. 2d 491; *State* v. *Cooey, supra; State* v. *Roe* (1989), 41 Ohio St. 3d 18, 535 N.E. 2d 1351; *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 22 OBR 203, 489 N.E. 2d 795; *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 15 OBR 379, 473 N.E. 2d 768.

## II
### *Consideration of Non-Aggravating Factors*

In proposition of law two, appellant argues that the jury improperly considered his prior 1976 manslaughter conviction as a non-statutory aggravating circumstance. During the guilt and mitigation phases, both the prosecution and the defense counsel avoided telling the jury about the 1976 manslaughter conviction. The trial judge found appellant guilty of the specifications in Counts II through VIII which referred to that conviction.

However, defense counsel did present, as defense exhibits, hundreds of pages of medical records and documents about appellant's background. That defense evidence showed numerous instances of fights, altercations, and appellant's explosive, impulsive behavior. At trial, defense counsel explained to the trial judge he had redacted any reference to the 1976 conviction.

After the jury started sentence deliberations, the jury asked: "Can we have any information on Lee's previous criminal background?" The judge told them to confine their deliberations to the evidence before them. The next morning the jury asked: "Can we have additional information regarding the incarceration we discovered? Length of sentence, charge, victim, parole? Any of the above." The judge responded, "All the relevant evidence is before you. You shall confine your deliberations to the evidence." Neither counsel objected to the court's answers to these questions, and these were only two of several other jury questions.

A review of defense exhibits indicates a cryptic handwritten note on one 1984 medical record page: "Incarcerated 6 years, released 2 yrs. ago, for shooting man while intox." The

next page also used the term "incarceration."

However, these facts do not demonstrate that the jury based its death sentence on the 1976 manslaughter conviction. Specifically, there is no evidence either that the jury knew the nature of the crime or that it used the conviction as a non-statutory aggravating circumstance. The jury did not know appellant killed anyone, only that he was incarcerated for shooting someone while intoxicated. The evidence fit precisely into the entire mitigation approach used by the defense.

The defense evidence explicitly recognized appellant's history since childhood of explosive, hostile, threatening behavior where he could not control himself. Defense witness Porter asserted that when a situation became emotionally stressful, appellant had to exert some effort to maintain control, and he was not always successful. She also asserted, "hospital records suggest that slight stressors have led to explosive behavior resulting in transfers to psychiatric units."

Dr. Goldsmith, a key defense witness, stressed appellant's anti-social personality disorder. In view of appellant's history, Goldsmith viewed the Village Lounge incident as of no importance: "This too was just another episode." "[T]ons of records * * * indicated various and sundry acts of anti-social behavior."

In sum, the defense strategy and evidence from various medical records demonstrated appellant's anti-social, explosive, and hostile behavior as well as altercations. The medical record briefly reflecting the 1976 incarceration simply exemplified this defense evidence. Defense counsel never attempted to portray appellant as a law-abiding or model citizen. As the court of appeals found, the record simply

does not reflect the jury viewed this cryptic reference as a non-statutory aggravating circumstance. Instead, it fit into appellant's "history, character and background," a factor that appellant argued strongly at trial was mitigating. See *State* v. *Hicks* (1989), 43 Ohio St. 3d 72, 77, 538 N.E. 2d 1030, 1036-1037, at fn. 3; *State* v. *Williams* (1986), 23 Ohio St. 3d 16, 23 OBR 13, 490 N.E. 2d 906. Under the particular circumstances, appellant's contention that the jury used this reference to the 1976 incident as a non-statutory aggravating circumstance lacks merit.

## III

### *Ineffective Assistance of Counsel*

In proposition of law three, appellant contends that counsel's failure to redact the reference to the 1976 incarceration denied him his Sixth Amendment right to counsel. In proposition of law four, appellant cites other examples of alleged ineffective assistance and urges the verdict and sentence be set aside.

Reversal of a conviction or sentence based on ineffective assistance requires appellant to meet the two-prong standard of *Strickland* v. *Washington* (1984), 466 U.S. 668. *Strickland* requires: (a) deficient performance, "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (b) prejudice, "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

As to counsel's performance, the United States Supreme Court recognized:

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence * * *. * * * [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." *Id.* at 689.

To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 695. See, also, *State* v. *Hester* (1976), 45 Ohio St. 2d 71, 79, 74 O.O. 2d 156, 160-161, 341 N.E. 2d 304, 310; *State* v. *Lytle* (1976), 48 Ohio St. 2d 391, 2 O.O. 3d 495, 358 N.E. 2d 623; *State* v. *Smith* (1981), 3 Ohio App. 3d 115, 3 OBR 130, 444 N.E. 2d 85. There must be a substantial violation of a defense counsel's essential duty and a showing of prejudice.

Appellant's counsel unquestionably made a mistake by failing to redact the cryptic reference to the 1976 incarceration. However, that mistake is not the kind of egregious and unprofessional conduct condemned by *Strickland.* We find that appellant's counsel's conduct fell within the wide range of reasonably professional assistance, and that appellant's counsel continued to function as the counsel guaranteed by the Sixth Amendment.

Appellant also fails to demonstrate prejudice, the second *Strickland* requirement. The 1976 incident consistently fit within the overall defense strategy at the mitigation hearing portraying appellant as a seriously disturbed veteran with an entrenched anti-social personality disorder. No reasonable probability exists that the result would have been different even without counsel's oversight.

In proposition of law four, appellant argues several other points in an attempt to show ineffective

12

assistance of counsel. First, he asserts that his counsel should have moved for a mistrial when it became apparent that a defense exhibit referred to the earlier shooting incident. However, defense counsel apparently decided, as a tactical choice, to let this jury decide this case, as submitted, and not take another chance before an entirely different jury. See *Wade* v. *Hunter* (1949), 336 U.S. 684, 689. Moreover, appellant did not establish that the judge probably would have or should have declared a mistrial. *State* v. *Scott* (1986), 26 Ohio St. 3d 92, 95-96, 26 OBR 79, 82, 497 N.E. 2d 55, 59. Defense counsel also chose not to request a further cautionary instruction. Counsel's tactical decision need not be second guessed at the appellate level. See *Strickland, supra,* at 689.

Second, appellant argues that his counsel should have had him enter a plea of not guilty by reason of insanity. However, counsel could have decided such a plea had no reasonable chance of success. To establish a successful insanity defense, appellant needed to prove that, "at the time of such conduct, as a result of mental disease or defect, he does not have the capacity either to know the wrongfulness of his conduct or to conform his conduct to the requirements of law." *State* v. *Staten* (1969), 18 Ohio St. 2d 13, 47 O.O. 2d 82, 247 N.E. 2d 293, paragraph one of the syllabus; *State* v. *Curry* (1989), 45 Ohio St. 3d 109, 543 N.E. 2d 1228.

The defense evidence never specifically linked appellant's mental problems to his conduct at the Village Lounge. Neither the testimony of Porter nor that of Goldsmith supported an insanity defense. Additionally, none of the voluminous defense exhibits supported such a defense. Appellant was quite intelligent, able to concentrate, and adept at high-level abstract thinking. While Goldsmith did assert appellant lacked substantial capacity to conform his conduct to legal requirements, that stemmed from appellant's ingrained anti-social personality disorder. See discussion in Part I.

With such evidence, appellant's counsel could have tactically decided that an insanity defense had no reasonable chance of success. Counsel need not raise every conceivable, tenuous defense on the vague hope that some jury might accept it. The record also fails to establish any reasonable basis to challenge appellant's competency to stand trial.

Third, appellant asserts that defense counsel failed to present proportionality evidence to the jury. However, no basis exists to admit such evidence. See *State* v. *Post* (1987), 32 Ohio St. 3d 380, 513 N.E. 2d 754.

Fourth, appellant contends that defense counsel did not ask certain jurors questions about the death penalty. However, those jurors had already expressed opinions on the subject. Juror Fullen opposed the death penalty. Juror Hussey could vote for it "[i]f I felt it warranted." Juror Anderson agreed the state could ask for the death penalty under certain circumstances.

Appellant also argues that defense counsel failed to ask enough voir dire questions or complain about the time limit on voir dire. In fact, the record shows a lengthy voir dire lasting several days and covering over six hundred pages of transcript. Additionally, the prospective jury members filled out an extensive questionnaire. Thus, appellant's contention lacks merit because he fails to meet either prong of the *Strickland* test, a deficient performance or prejudice. Moreover, at trial, appellant personally complained about the length of the voir dire.

## IV
### Peremptory Challenges

In proposition of law five, appellant argues that the state, through its peremptory challenges, deprived him of a fair and impartial trial by systematically excluding prospective jurors opposed to the death penalty. However, since appellant failed to object to this at trial, he did not preserve any error. See *State* v. *Long* (1978), 53 Ohio St. 2d 91, 7 O.O. 3d 178, 372 N.E. 2d 804; *State* v. *Williams* (1977), 51 Ohio St. 2d 112, 5 O.O. 3d 98, 364 N.E. 2d 1364.

Additionally, we have previously rejected similar attempts to extend the limited principle of *Batson* v. *Kentucky* (1986), 476 U.S. 79, which restricted prosecutorial peremptory challenges based on race. Aside from racial exclusion, prosecutors can exercise a peremptory challenge for any reason, without inquiry, and without a court's control. See *State* v. *Esparza* (1988), 39 Ohio St. 3d 8, 13-14, 529 N.E. 2d 192, 198 (exclusions based on death penalty views); *Lockhart* v. *McCree* (1986), 476 U.S. 162.

Appellant's arguments also fail on the facts. Several of the challenged jurors accepted the death penalty. Others could have been challenged for cause. Thus, the record shows that the state did not systematically use its peremptory challenges to exclude those opposed to the death penalty. Appellant's contention lacks merit both on the law and the facts.

## V
### Sufficiency of Evidence

In propositions of law six, seven and eight appellant argues the alleged insufficiency of evidence to sustain convictions for the aggravated murder and kidnapping of Norris and the felonious assault against police officer McDaniel.

Upon appeal, we judge the sufficiency of evidence as follows:

"A reviewing court will not reverse a jury verdict when there is substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt." *State* v. *Eley* (1978), 56 Ohio St. 2d 169, 10 O.O. 3d 340, 383 N.E. 2d 132, syllabus. Accord *State* v. *Eskridge* (1988), 38 Ohio St. 3d 56, 526 N.E. 2d 304, paragraph two of the syllabus.

We have also held:

"Pursuant to Criminal Rule 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State* v. *Bridgeman* (1978), 55 Ohio St. 2d 261, 9 O.O. 3d 401, 381 N.E. 2d 184, syllabus. See, also, *State* v. *Antill* (1964), 176 Ohio St. 61, 26 O.O. 2d 366, 197 N.E. 2d 548; *State* v. *Brown* (1988), 38 Ohio St. 3d 305, 528 N.E. 2d 523, paragraph four of the syllabus.

In proposition of law six appellant asserts that the evidence does not show he purposefully killed Norris. Appellant argues that the shot was aimed at Norris' back instead of his heart or head, and thus was not necessarily fatal.

Purpose requires an intention to cause a certain result or to engage in conduct that will cause that result. See R.C. 2901.22(A). "It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts." *State* v. *Johnson* (1978), 56 Ohio St. 2d 35, 39, 10 O.O. 3d 78, 80, 381 N.E. 2d 637, 640; *State* v. *Thomas* (1988), 40 Ohio St. 3d 213, 217, 533 N.E. 2d 286, 290. Intent can be deter-

mined from the surrounding facts and circumstances. See *State* v. *Johnson, supra,* at 38, 10 O.O. 3d at 80, 381 N.E. 2d at 640; *State* v. *Robinson* (1954), 161 Ohio St. 213, 53 O.O. 96, 118 N.E. 2d 517, paragraph five of the syllabus. "[A] firearm is an inherently dangerous instrumentality, the use of which is likely to produce death." *State* v. *Widner* (1982), 69 Ohio St. 2d 267, 270, 23 O.O. 3d 265, 266, 431 N.E. 2d 1025, 1028. Accord *State* v. *Clark* (1978), 55 Ohio St. 2d 257, 9 O.O. 3d 257, 379 N.E. 2d 597.

The evidence shows that appellant threatened several times to kill two other men and, together with his armed accomplice, restrained all the patrons from leaving. Appellant then intentionally fired a pistol, from a distance of less than twelve inches, into Norris' back. The revolver required a seven-pound pull. Additionally, appellant refused to allow anyone to help Norris. After he shot Norris, appellant said that he had to shoot him to "show you South End people that I meant business."

Under the circumstances, the jury could reasonably conclude that appellant purposely killed Norris. Appellant's proposition of law six lacks merit.

In proposition of law seven, appellant argues that the evidence did not prove that he actually restrained Norris, and hence urges that Count IV, the kidnapping of Norris, must be reversed. He contends that since Norris ignored his order to lie down on the floor, he never restrained Norris of his liberty.

R.C. 2905.01, kidnapping, provides:

"(A)  No person, by force, threat, or  deception  * * *  shall  remove another from the place where he is found or restrain him of his liberty, for any of the following purposes:

"* * *

"(3)  To  terrorize,  or  to  inflict serious physical harm on the victim or another;

"* * *.

"(B)  No person, by force, threat, or deception, * * * shall knowingly do any  of  the  following,  under  circumstances which create a substantial risk of serious physical harm to the victim:

"* * *

"(2)  Restrain another of his liberty[.]"

Thus,  kidnapping  under  R.C. 2905.01 can involve *either* an abduction or restraint of another for any of several specified purposes.

Appellant's  argument  that  he never kidnapped Norris ignores crucial events  preceding  his  repeated demands that Norris lie on the floor. Appellant and his accomplice, clearly acting in concert, entered the Village Lounge with drawn guns. Appellant's accomplice carried a shotgun, stood at the front door, and barred anyone, including Norris, from leaving. Waving a revolver, appellant ordered the barmaid  off  the  phone,  forced  the Schoenbergers to lie on the floor, and repeatedly threatened to kill them. He then roamed the bar searching for their friends, and Norris admitted being  their  friend.  Appellant  made threats to all, including Norris. He repeatedly ordered Norris to lie on the floor. Norris refused. Appellant then put his hand on Norris' shoulder and shot him in the back.

Under  these  facts  and  circumstances, a jury could reasonably conclude  that  appellant  restrained Norris of his liberty. Appellant's purpose and actions were clearly intended to terrorize both the Schoenbergers and their friends, as well as the other bar  patrons.  R.C.  2905.01(A)(3).  Appellant also created a substantial risk

of serious physical harm to the victim, Norris, as evidenced by his subsequent murder. R.C. 2905.01(B)(2). See *State* v. *Eley, supra;* *State* v. *Bridgeman, supra.*

The fact that a kidnapping victim, in the course of a kidnapping, refuses to obey an order from a kidnapper, at his peril, does not negate the kidnapping. The trier of fact may draw permissible inferences from the evidence. See *State* v. *Nicely* (1988), 39 Ohio St. 3d 147, 529 N.E. 2d 1236; *Hurt* v. *Charles J. Rogers Transp. Co.* (1955), 164 Ohio St. 329, 58 O.O. 122, 130 N.E. 2d 820. The trier of fact, not appellate judges, needs to be convinced. *State* v. *Petro* (1947), 148 Ohio St. 473, 501, 36 O.O. 152, 163, 76 N.E. 2d 355, 369.

Appellant clearly killed Norris in the course of kidnapping the Schoenbergers and Norris, while restraining them for the purpose of terrorizing the Schoenbergers (R.C. 2905.01[A][3]). He also kidnapped Norris and the Schoenbergers by restraining them of their liberty when the circumstances created "a substantial risk of serious physical harm" to the victims. (R.C. 2905.01[B][2].)

In proposition of law eight, appellant contends that the evidence does not support his conviction for felonious assault against McDaniel, Count VII. Appellant correctly points out:

"The act of pointing a deadly weapon at another, without additional evidence regarding the actor's intention, is insufficient to convict a defendant of the offense of 'felonious assault' as defined by R.C. 2903.11 (A)(2)." *State* v. *Brooks* (1989), 44 Ohio St. 3d 185, 542 N.E. 2d 636, syllabus.

However, appellant overlooks additional evidence regarding his intention that night. For example, his revolver was not just loaded, it was cocked. Appellant had already terrorized the Schoenberger brothers by threatening to kill them and forcing them to the floor. He had just shot Norris and threatened to kill everyone in the bar if they did not tell the police that an unknown black man had shot Norris. In the midst of this, McDaniel appeared, identified himself as a police officer, and twice ordered appellant to drop his gun. After initially lowering his gun, appellant then raised it and pointed it at McDaniel.

From these additional facts, the jury could find that all the elements of this felonious assault offense had been proven beyond a reasonable doubt. See *State* v. *Brooks, supra,* at 192 and 196, 542 N.E. 2d at 643 and 646 (Moyer, C.J., concurring); *State* v. *Eley, supra;* *Jackson* v. *Virginia* (1979), 443 U.S. 307.

## VI
### *Mitigation Burden of Proof*

In propositions of law nine, eleven, twelve, and nineteen, appellant specifically attacks the constitutionality of Ohio's statutory scheme as to proof of mitigating factors. Initially, he appears to concede a waiver by defense counsel's failure to object. See *State* v. *Long, supra;* *State* v. *Williams* (1977), *supra.* Only plain error would be reserved. See *State* v. *Long, supra.*

Moreover, we have rejected similar arguments attacking Ohio's statutory system. *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 171, 15 OBR 311, 317, 473 N.E. 2d 264, 275, held that a trial court did not err by requiring the defense to establish mitigating factors by a preponderance of evidence. *State* v. *Stumpf* (1987), 32 Ohio St. 3d 95, 101-102, 512 N.E. 2d 598, 605-606, reaffirmed *Jenkins.* *State* v. *Lawrence, supra,* at 27, 541 N.E. 2d at 455-456, did recommend jury instructions more closely parallel to the actual statutory language. However, requir-

ing an accused to establish mitigating factors, even by a preponderance, remains constitutionally valid. See *Walton* v. *Arizona* (1990), 497 U.S. ___, 111 L. Ed. 2d 511, 110 S. Ct. 3047; *McKoy* v. *North Carolina* (1990), 494 U.S. ___, 108 L. Ed. 2d 369, 382, 110 S. Ct. 1227, 1234 (White, J., concurring); *State* v. *Lott* (1990), 51 Ohio St. 3d 160, 170, 555 N.E. 2d 293, 304.

The state need not prove the absence of mitigating factors, but the state is required to prove beyond a reasonable doubt that aggravating circumstances outweigh mitigating factors. *State* v. *Jenkins, supra,* at 172, 15 OBR at 318, 473 N.E. 2d at 275. Though appellant claims otherwise in proposition of law eleven, neither the trial judge nor the statute prevented him from presenting relevant evidence on sentencing. R.C. 2929.04(B)(7) and (C). In fact, appellant presented post-offense rehabilitation evidence and other mitigation evidence. See *Eddings* v. *Oklahoma, supra; Skipper* v. *South Carolina* (1986), 476 U.S. 1. As to appellant's proposition of law twelve, *State* v. *Stumpf, supra,* at 101-102, 512 N.E. 2d at 605-606, upheld the constitutionality of R.C. 2929.03(D)(1) and held that Ohio's statute gives fair notice of who is to bear the burden of proof.

In proposition of law nineteen, appellant argues that a capital defendant could choose to commit state-sponsored suicide by not presenting mitigating evidence. This argument lacks relevance, as appellant presented a mitigation case; it also lacks merit. See *State* v. *Tyler* (1990), 50 Ohio St. 3d 24, 27-29, 553 N.E. 2d 576, 583-586; *Whitmore* v. *Arkansas* (1990), 495 U.S. ___, 109 L. Ed. 2d 135, 110 S. Ct. 1717. In sum, appellant's propositions of law nine, eleven, twelve, and nineteen lack merit.

## VII
### *Sentencing Errors*

In proposition of law ten, appellant asserts that the trial court and court of appeals erred in refusing to consider several mitigating factors under R.C. 2929.04(B). The state strenuously argues that these factors were not proven.

Although R.C. 2929.04(B) requires the trial court to *consider* the factors listed therein, the fact-finder need not find that the evidence *establishes* a particular mitigating factor. *State* v. *Post, supra,* at 389, 513 N.E. 2d at 764; *State* v. *Stumpf, supra,* at 101, 512 N.E. 2d at 605; *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 117, 31 OBR 273, 278, 509 N.E. 2d 383, 390. "In fact, the assessment and weight to be given mitigating evidence are matters for the trial court's determination." *State* v. *Lott, supra,* at 171, 555 N.E. 2d at 305.

In this case, Norris did not "induce or facilitate" his own murder. R.C. 2929.04(B)(1). Appellant also failed to show any "duress, coercion, or strong provocation." R.C. 2929.04(B)(2). See discussion in Part I.

Appellant also contends that he lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. R.C. 2929.04 (B)(3). Despite appellant's extensive mental problems, a fact-finder could reasonably find this factor was not proved. R.C. 2929.04(B)(3) requires "a mental disease or defect" operative "at the time of committing the offense." The defense evidence failed to link appellant's mental problems to the crimes he committed at the Village Lounge. (See Part I, *supra.*) What "other factors" are mitigating under R.C. 2929.04(B)(7) is an issue for the individual fact-finder. *State* v. *Steffen, supra,* paragraph two of the syllabus;

*State* v. *Lott, supra,* at 171, 555 N.E. 2d at 305.

## VIII

### *New Trial*

In proposition of law thirteen, appellant argues that the trial judge should have granted a new trial based on error, irregularity or surprise during the trial, and newly discovered evidence. In response, the state denies appellant had any basis for a new trial and relies on the trial court's discretion to deny a new trial.

Under Crim. R. 33(A), grounds for a new trial include irregularity in the proceedings preventing a fair trial, accident or surprise, error of law, and newly discovered evidence. Crim. R. 33(A)(1), (3), (5), and (6). Granting or denying a new trial on the basis of newly discovered evidence rests within the competence and discretion of the trial judge. "* * * [I]n the absence of a clear showing of abuse such decision will not be disturbed." *State* v. *Williams* (1975), 43 Ohio St. 2d 88, 72 O.O. 2d 49, 330 N.E. 2d 891, at paragraph two of the syllabus.

In *State* v. *Petro, supra,* syllabus, we held:

"To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence."

Appellant asserts three grounds for a new trial. First, he argues that the jury discovered that he had been incarcerated for shooting a man while intoxicated. However, that fact does not qualify as "an irregularity in the proceedings, accident or surprise, or error" within the meaning of Crim. R. 33(A)(1), (3), or (5). The jury learned of this fact from a defense exhibit. The judge did not err in the ruling, nor did the prosecutor act improperly. A party cannot take advantage of an error he invited or induced. *Center Ridge Ganley, Inc.* v. *Stinn* (1987), 31 Ohio St. 3d 310, 31 OBR 587, 511 N.E. 2d 106; *Hal Artz Lincoln Mercury, Inc.* v. *Ford Motor Co.* (1986), 28 Ohio St. 3d 20, 28 OBR 83, 502 N.E. 2d 590, at paragraph one of the syllabus. Moreover, evidence of that incarceration did not necessarily prejudice appellant. See discussion in Part II.

Second, appellant seeks a new trial contending an accused should not bear the burden of proving mitigating factors. Appellant's arguments lack merit. See discussion in Part VI.

Third, appellant contends that newly discovered evidence would have affected his trial result. This evidence consisted of: (a) affidavits from his mother and siblings about his early home life; (b) additional state hospital, military, and VA medical records; and (c) two additional mental evaluations by psychologists Terry A. Carlson and James C. Tanley.

However, this evidence offers no new revelations and does not meet the *Williams* and *Petro* requirements for a new trial. No strong probability of a different result exists. The military, VA, and state hospital records only corroborate the extensive medical records at trial. Tanley simply concluded that appellant lacked capacity, at times, to exercise appropriate reason, judgment, and inhibition of his impulses. Carlson concluded appellant

did not meet the criteria for post-traumatic stress disorder. At best, these two evaluations duplicate the psychological testimony presented at trial. See *State* v. *Duling* (1970), 21 Ohio St. 2d 13, 17, 50 O.O. 2d 40, 42, 254 N.E. 2d 670, 672.

Aside from some state hospital records (duplicates recovered from the VA), appellant also failed to establish that, with due diligence, this evidence could not have been presented at trial. Testimony from appellant's family was clearly available earlier, as his mother testified at trial. Most of the records, as well as the additional psychological testimony, could readily have been presented earlier. Moreover, the evidence attached to the new trial motion was largely cumulative. Thus, appellant's arguments for a new trial lack merit.

## IX

### *Constitutionality*

In propositions of law fourteen through eighteen and twenty and twenty-one, appellant attacks the constitutionality of Ohio's death penalty statutes. In proposition of law fourteen, appellant raises the issue of due process, and argues the lack of compelling state interest, the failure of deterrence, and the availability of imprisonment as a less onerous penalty. We have previously rejected these arguments. *State* v. *Jenkins, supra,* at 168, 15 OBR at 314-315, 473 N.E. 2d at 272-273; *State* v. *Apanovich* (1987), 33 Ohio St. 3d 19, 26, 514 N.E. 2d 394, 402. We have also rejected appellant's Eighth Amendment and Fourteenth Amendment equal protection challenges, along with his other arguments in proposition of law fifteen. *State* v. *Jenkins, supra,* at paragraph one of the syllabus, 168-172, 177, 15 OBR at 314-318, 322, 473 N.E. 2d at 273-276, 279; *State* v. *Byrd*

(1987), 32 Ohio St. 3d 79, 86, 512 N.E. 2d 611, 619; *State* v. *Buell, supra,* at 136, 22 OBR at 213-214, 489 N.E. 2d at 806-807; *State* v. *Poindexter* (1988), 36 Ohio St. 3d 1, 520 N.E. 2d 568.

In proposition of law sixteen, appellant argues that Ohio's death penalty statutes impermissibly reduce the reliability of the guilt determination, limit the jury's consideration of mitigating evidence, and increase the inevitability of caprice and mistake. Appellant's arguments lack merit for the following reasons.

### A

As we held in *State* v. *Mapes* (1985), 19 Ohio St. 3d 108, 19 OBR 318, 484 N.E. 2d 140, at paragraph two of the syllabus: "* * * R.C. 2903.01(D) requires a finding that the accused intentionally caused the death of another for a conviction of aggravated murder." See *State* v. *Jenkins, supra,* at 170-171, 15 OBR at 316-317, 473 N.E. 2d at 274-275. Moreover, the evidence is undisputed that appellant was the trigger man.

### B

Appellant's claim that proof beyond all doubt is required has been rejected. *State* v. *Jenkins, supra,* at paragraph eight of the syllabus; *State* v. *Maurer, supra,* at paragraph six of the syllabus.

### C

The reliability of sentencing is not impaired by aggravating circumstances being proved during the guilt phase. *State* v. *Jenkins, supra,* at 173-174, 15 OBR at 319-320, 473 N.E. 2d at 277-278; *State* v. *Morales* (1987), 32 Ohio St. 3d 252, 259, 513 N.E. 2d 267, 275.

### D

The death penalty statutes are not vague. *State* v. *Stumpf, supra; State* v.

*Buell, supra,* at 139-140, 22 OBR at 216-217, 489 N.E. 2d at 808-809.

### E

Ohio's statute does not create a mandatory death penalty. *State* v. *Buell, supra,* at 141, 22 OBR at 217-218, 489 N.E. 2d at 810. See, also, *Boyde* v. *California* (1990), 494 U.S. ____, 108 L. Ed. 2d 316, 110 S. Ct. 1190.

### F

The state need not prove the absence of mitigating factors. See discussion in Part VI.

We have rejected appellant's proposition of law seventeen, challenging the constitutionality of Ohio's bifurcated sentencing structure. *State* v. *Mapes, supra,* at 116-117, 19 OBR at 325-326, 484 N.E. 2d at 147-148; *State* v. *Zuern* (1987), 32 Ohio St. 3d 56, 63, 512 N.E. 2d 585, 592. See, also, *Lockhart* v. *McCree, supra.* Contrary to appellant's claims in proposition of law eighteen, Ohio death penalty statutes do not impermissibly encourage guilty pleas. See *State* v. *Buell, supra,* at 138, 22 OBR at 215, 489 N.E. 2d at 808.

In proposition of law twenty, appellant argues that the aggravating circumstance of kidnapping is unconstitutionally broad as "*[e]very* murder contains a technical kidnapping and, therefore, a potential capital charge." However, we have more narrowly construed the aggravating circumstance of kidnapping. *State* v. *Jenkins, supra,* at 197-198, 15 OBR at 339-340, 473 N.E. 2d at 295; *State* v. *Maurer, supra,* at 243, 15 OBR at 382,

473 N.E. 2d at 775 (prolonged restraint, secretive confinement, or significant movement); *State* v. *Buell, supra,* at 141-142, 22 OBR at 218, 489 N.E. 2d at 810-811. With his armed accomplice barring any exit from the bar, appellant restrained all the patrons from leaving for approximately twenty to forty minutes. He then terrorized and threatened the Schoenbergers and their friends. His actions and the aggravating circumstances of kidnapping the Schoenbergers and Norris were not merely incidental to killing Norris. In the course of kidnapping and terrorizing the bar's patrons, appellant shot Norris.

In proposition of law twenty-one, appellant argues that Ohio's statutes constitute a mandatory sentencing scheme which unconstitutionally precludes a jury from deciding if death is, in fact, an appropriate sentence. We have also rejected that argument. *State* v. *Buell, supra,* at 141, 22 OBR at 217-218, 489 N.E. 2d at 810. Moreover, the United States Supreme Court has recently found similar state statutes to be constitutional. See *Blystone* v. *Pennsylvania* (1990), 494 U.S. ____, 108 L. Ed. 2d 255, 110 S. Ct. 1078; *Boyde* v. *California, supra.*

For the foregoing reasons, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY, HOLMES, DOUGLAS, WRIGHT and H. BROWN, JJ., concur.